You're not going to read all those binders to us, are you? No. Okay. Short answer. No. Mr. Kratz. Yes. May it please the court. I'm Tim Kratz. I'm with McGuire Woods. I represent Milam Pharmaceuticals. I'll be arguing on behalf of all of the appellants, except for I'd like to, of all the errors laid out in the briefing, sent to briefings in this case, I'd like to focus today on two specific errors that, when combined, that will result in a complete reversal of the 819 patent, the judgment on the 819 patent. The first of the two errors is the de novo review of the trial court's legal conclusions regarding the priority date of Claim 2 of the 819 patent. And the argument here is that once the priority date is properly applied, which is 1992, then the Claim 2 will fall based on the anticipation that exists in the prior argument. And then the second of the two arguments is the de novo review of the application of the prosecution history of estoppel as it relates to the doctrine of equivalence finding with respect to Claims 1 and 4 of the patents. Once those two errors are corrected, then you will find an invalidity of Claim 2 of the 819 patent and non-infringement of Claims 1 and 4. Those are the three asserted claims from the 819 patent warranting a justified reversal. Can I just ask you a housekeeping question with respect to the interplay between those? If we were to disagree with you with respect to your first argument on Claim 2 and on the list that we adopted to support claims construction and so forth, is there any relevance in our reviewing Claims 1 and 4 of the DOE issue specifically? If the court were to affirm all of the arguments with respect to the validity of Claim 2, then Claim 2 would act as an infringing ballot claim. And therefore, any arguments, even if we agree with them with respect to Claims 1 and 4 on DOE, would fall out in any event, right? Yes, that would be the correct result. That was hypothetical. Certainly. No, I totally understand the question, and I believe that's the answer. I'll defer to Sun's position, which is slightly different with respect to Claim 2, because their argument does carry over to Claims 1 and 4 as well. But with respect to our validity argument, the defendants that I'm speaking on behalf of, our Claim 2 argument is with respect to Claim 2. That's held to be valid. And the flip side is true. Our non-infringement position is with respect to Claims 1 and 4 only. But with one exception, there is a claim construction appeal with respect to the scope of Claim 2. But if the court were to find that it's infringed under the current court's claim construction and valid, then Claim 2 would survive on its own. So I'd like to turn then to the priority date argument with respect to the enablement of the Claim 2. The trial court erred by not requiring enablement to the full scope of Claim 2. Claim 2 is specifically constructed at plaintiff's urging, included the specific enantiomers that were known at the time of the application in 1990, and the court specifically held that it included the PRS enantiomer, the PRR enantiomer, as well as the racemate and the racemic mixtures. In the original application, which was filed in 1990 at a time in which they were fully aware of the existence of enantiomers, they just couldn't separate them, they made a single sentence as an enabling disclosure for the full scope of the claim. The single sentence was, you can separate the enantiomers by the methods already known in the art. That's all they said. And that's all they said, and that is insufficient of the disclosure, and it would be unprecedented for this court to affirm that disclosure as fully enabling the scope of the Claim 2. The court has been quite clear in Genentech and others that reference to prior art alone is not enabling, where it doesn't disclose, for example, the starting materials and experimental conditions. The trial court's basis for accepting this as enabling disclosure was reliance on in-ray hoping, which is absolutely distinguishable, because on its face, it applied only to later-discovered technology. And the court made clear plant genetic systems. But didn't the court find specifically, as a matter of fact, that a person of skill in this art, very high skill, would have been able to separate the two racemacs into their separate enantiomers? The court did attempt some analysis of whether or not this was an enablement situation. The court didn't. Part and parcel to that holding was an acceptance that the enabling disclosure was sufficient. And that's the problem we have with the application in 1990. Regardless of the state of the art— The PTO found it enabled, too, right? The PTO did, and they issued the patent. The PTO didn't have the full trial and didn't have the evidence in front and didn't have the—perhaps was not focused on the teachings of the Genentech case and the plant genetic systems case, which make it very clear that that's not acceptable. The priority date should be 1992. I don't understand. Is this wrong? Because I looked at the district court opinion, and I thought the red brief on page 49, which characterizes it the way that Chief just asked in his question, is correct. It would be what the district court decided. And I understand you say no to him, so let me be clear. They say the district court found by November 1990 purification of anatomers that the classical resolution techniques was routine, systematic, and predictable as evidenced by publications in 77 and 81. And I'm not asking you whether the district court was correct in that finding. I know you don't think they were. But are you saying that's not even a fact finding that the district court made? No, I think that's a fact finding the district court made, but part and parcel to that fact, which we do disagree with and the facts of the case play out that it was not true. They ended up having to bring in a specialist to basically invent a new way of getting those enantiomers separated in this case. But part and parcel to that finding is an acceptance that the enabling disclosure was sufficient as a matter of law. And it simply isn't. Even if it's absolutely true that you could, under the state of the art at the time of 1990, separate enantiomers, they do not disclose the experimental conditions. They don't disclose the starting materials. I'm not understanding. And I don't maybe understand the technology as much as I wish I did. But if the district court says the resolution techniques were routine, systematic, and predictable, why do we need more? R&S just has to be separate, separatable. But it requires a tremendous amount of experimentation. And in order to get priority action. But his holding was routine, systematic, and predictable. I think that he found against you on the experimentation. I understand that. When they ultimately disclosed the conditions in which that separation could occur, which they did in 1992, it took them 12 pages to substitute the single line of saying that you could do it by means of the ordinary art. It took them 12 pages to describe the actual experimental conditions upon which this could occur. The point of fact was in 1990, they tried to separate the enantiomers using the ordinary means in the art. They couldn't get any better than 75%.  Thank you, Mr. Kratz. Your time has expired. Mr. Hurst? May it please the court, Jim Hurst on behalf of SUN. We have a fairly extraordinary situation here. The applicants repeatedly and unequivocally represented that they did not invent in 1990 what Pfizer is claiming now that they did invent in 1990. To satisfy the written description requirement, that 1990 application has to reasonably convey that the inventors possessed the claimed invention. The claimed invention here is the S enantiomer by itself, 100% pure, free from the R enantiomer. They failed to satisfy the written description requirement from 1990 out, meaning the 1992 priority date applies for all three relevant claims for two reasons. First, if you read the original 1990 application, there is nothing reasonably conveying possession of the claimed invention. Pfizer points to the fact that they recite the S enantiomer chemical formula, but that's not the claimed invention. That doesn't distinguish between the S enantiomer being part of the racemic mixture, or any mixture, or the S enantiomer being separate by itself, 100% pure, and apart from the R enantiomer. There's nothing in the original application saying isolated by itself, alone, S enantiomer. That's one reason. The second reason is... Wait, why does it have to recite the words 100% pure? It says S enantiomer. I know I'm saying these words wrong. Enantiomer. Thank you. So why does it have to say 100% pure? It's distinguishing between R and S. Why do you want the spec to say that? Because when you just recite S enantiomer by itself, you don't actually make a distinction between whether it's by itself, or whether it's part of the racemic mixture. That's what the Patent Office made as their point of eight years of argument. They said, look, if you're just saying S enantiomer, it could be part of the racemic mixture, or it could be part of itself. That was an eight-year debate. And that's all the original application says, S enantiomer. It doesn't say separately, it's by itself, alone, and isolated. They lose for a second reason. Pfizer is stopped under the Bradford case of claiming priority under the 1990 application. You remember, they deleted from the original application the one reference to potentially resolving these two enantiomers. And then they told the Patent Office, unequivocal terms, isolating the S enantiomer clearly required invention by Dr. Yoon. That's what they said. And they said, isolating the S enantiomer was far from routine. That's what they said. They said it repeatedly, and they never retracted it. It was never retracted. So the state of the prosecution history is, the inventors are saying, we did not invent the isolated S enantiomer as of 1990. Under Bradford, that is a stopple. What is Pfizer's only argument back? They say reliance. They say there was reliance in the Bradford case. There was no reliance here by the PTA. In Bradford, the patentee made an express statement, admission during prosecution, that their application didn't disclose a feature of the claimed invention. Therefore, they couldn't claim that it later did. That's not what happened here. Here they argued, and the examiner agreed with them. With respect, Your Honor, that's exactly what they argued. Because remember what the claimed invention is, according to Judge Sleet. It is the isolated S enantiomer free from the R enantiomer. They said to the patent office repeatedly, we didn't invent that. We couldn't do that. That was not invented until 1992 when Dr. Yoon came along. So they clearly said they did not.  Thank you, Your Honor. By the way, you split your time. It gets enforced a little more rigidly. Don't split your time in the future. You'll have more of it. Mr. Dreeb. Dreeb is from White and Case for Pfizer and Northwestern. Claim two of the 819 patent is 4-amino-3-2-methylpropylbutanoic acid for pharmaceutical software. That's exactly what these two inventors invented. And it covers any form of that compound that has that formula. And that compound would show to have unexpected properties. Other secondary considerations would show it was totally not obvious in view of the prior argument. What claim two, the enablement of claim two, the application need only show how to make that compound. And what defendants are arguing here is that you have to show how to separate this racemic mixture. When they made that racemic mixture, it contained both the R and the S enantiomer. That was part, they had made both of those. And the initial application, the 692 application, said R comma S or RS. And they claimed all forms of that preferred compound. The court, in a very reasoned, meticulous opinion, analyzed the experts before it, the credibility of their testimony, and determined that it was routine. If capable of a person of ordinary skill in the art, would routinely separate those two enantiomers starting with the racemic mixture. And that is the key. The court assessed the credibility of the witnesses and reviewed all the evidence, including the evidence of Dr. Ewan making a synthetic method, which is different from a resolution. What Dr. Ewan did and was added in the 1992 patent CIP was a synthetic method of making each of the single enantiomers separate from resolving the two by the routine resolution methods using diastereomers. Dr. Davies, who testified on behalf of defendants on the enablement issue, the whole thrust of his testimony was that there was nothing in the prior art to show the resolution of 3S isobutyl gather. Not that it was not routine, a routine method in the prior art. Dr. Rausch, who testified on behalf of Pfizer and Northwestern, went through the numerous references that were available in the art that allowed a person of skill in the art to do those resolutions. Do you agree with opposing counsel that if we were to find for you on one of these claims, that would end the inquiry and we wouldn't need to reach the other claims? i.e., does the injunction stand or fall entirely if any one claim survives? Yes, claim 2 survives, the case is over. Claim 1, which is the claim that Sun is now arguing was not described sufficiently, is to the S enantiom. The court and the patent office both found support in the written description of the first filed application for the S enantiom. And what they are saying is the application did not enable the S enantiom, which is different from written description. As far as the estoppel argument, there was no estoppel. There was never any attempt to give up on claiming the S enantiom, and it was always present in the patent, in the application. As far as the estoppel with Dr. Jung, there was never a concession. Well, they were persuaded. They put all the evidence before the examiner, the evidence that Dr. Pavia at Pfizer tried to resolve and didn't when he achieved a 75 to 25 separation of the starting materials to do the resolution. The examiner looked at the U.N. synthesis. The examiner considered that Pfizer had also used the standard techniques and subsequently had resolved the enantiomers using three out of 14 of the reagents that were available in the art. The court also considered that two of the defendants used one of those standard reagents to make their commercial product. The prior art was just a 50-50 racemic mix, right? The prior art... The Andruskovich publication, which they would like to bring in as a reference should they get the 1992 data, was a racemic mixture of three isobutyl gap. That was the inventor's own publication. So to distinguish that, all you had to do was separate those and be able to isolate... Do you have to isolate it to 100% pure S plus 3-IGB? There was testimony at trial that any organic chemist would consider 99.8% to be pure. Now the court's claim interpretation construes the single optical isomer as free of R, but that of course also has to consider the limits of detection that is available in the art. As there was testimony at trial, you could never disprove that there isn't one molecule of R in your S composition. During prosecution, this isn't just a case where they cite a 50-50 against you and then you come back and say, no, it's only one or the other. I mean, this was a long and tortured prosecution, during which time you morphed from no particular level of purity to substantially pure, from there to a single individual anatomy... I keep saying that word wrong, whatever it is. But you even said at one point, the examiner incorrectly concludes that the claim does not require any particular purity. So you actually fault in your appeal brief before the board the idea that the claim does not require purity. There's a distinction between claim 2 and claim 1. Claim 1 is to the S enantiomer as a single optical isomer. I guess I thought that's what we were talking about. Did I miss it? Did we switch to something else? Well, no. The enablement argument goes to both. They're saying to enable claim 2... No, I'm not talking about enablement. I'm talking about prosecution history. Stop. You sort of morphed it together in your discussion, and I may be a little slow. You might have moved beyond it after that. I misunderstood. I'm talking about prosecution history. Prosecution history estoppel as to whether they would infringe claim 1, whether prosecution history estoppel. Yeah, now we're on the same page. Now, they never... The purpose of the amendment was to distinguish the racemic mixture. At the time, because of the inventorship of the application, including UN, the examiner took the position that the other inventors, Silverman and Andruskowicz, that their 1989 publication would be prior art, and that was the invalidating reference. The applicants argued, no, UN was the one that invented S, and those other two, the two primary inventors, invented the racemic mixture. They put those arguments before the examiner. They never conceded that the publication should be prior art, and they never gave up the claims to the racemic mixture. Yes, but nonetheless, their response by way of argument and amendment was consistently to reinforce absolute purity as a requirement of these claims. And it didn't start that way, but he evolved into that position. You started by trying to change the claims to substantially pure, but when the examiner rejected that, you relinquished it, and then said the examiner's incorrect in concluding the claim does not require any particular purity, and then you added the language about a single optical isomer. I don't know how that could be any clearer. You may not have had to give those things up, because you may well be right that the prior art shouldn't have been considered prior art against you, but you did. And so that's my problem, which is, I don't think you had to give it up, but you chose to, and the world thinks you did, so why shouldn't they hold you to it? First of all, the First Amendment, which says substantially pure, was never entered, never considered. The examiner, in not entering the amendment, made some statements that substantial was not a definite term, and that he questioned whether there was support in the specification for the term substantial. At that time, the racemic mixture claims were under appeal. Then, prosecution was reopened during the appeal process, and in order to distinguish the claims, and there was still the issue of inventorship, they submitted the claim with single optical isomer. In order to distinguish the racemic, which was their own invention, their own art, and they never conceded that it was prior art, they later changed the inventorship to remove that reference. But before it got remanded to the examiner, Pfizer argued in its appeal brief before the board, the examiner incorrectly concludes that the claim does not require any particular purity, and as such is open to any composition of matter containing the recited isomer. Correct. Well, that is not just talking about a racemic. You're saying the examiner is incorrect to the extent that he believes the composition only has to contain the recited isomer and then can have other stuff. You're stressing particular purity. The board then remands for that basis, for a proper response from the examiner on that point, and you step in and you amend the claim to say single optical isomer. Correct. Well, you've taken the issue off the table now. No, you haven't. Well, really, why at that point would the examiner believe, after you said single optical isomer in response to that set of circumstances, the examiner is still going to believe that you're attempting to claim a mixture? No, not a mixture. The examiner believed, and it's in the interview summary record, that putting in single optical isomer distinguishes it from the racemic, which is 50-50. Really? Because how would the examiner understand that when the argument you made to the board, which was remanded to the examiner to address, was about purity? Not about racemic, which is 50-50, but about purity. Whether the claim to the S optical isomer recited enough purity to distinguish the 50-50. Not enough purity, that's not what you said, but all right. You're going to fight me on everything. No, it's not a fight. If the claim was to the single optical isomer, that's what they were trying to distinguish from the racemic. Not at that point it wasn't. The claim was not to a single isomer. It wasn't. No, no, no. That's why the examiner said it wasn't, because you didn't have a purity determination in the claim, therefore it reads on the racemic. And so not only did you add one, but you added one and said the examiner was incorrect to conclude the claim doesn't require a particular purity. What particular purity can I interpret from a single optical isomer? That was added after that. Single optical isomer was added to show the purity. Exactly. Right. And that's exactly what they wanted to cover, the pure single optical isomer, which is what the defendants are trying to sell. So they didn't give up that subject matter. The claim is directed to the subject matter, which they wanted to cover exactly. And there was no surrender of anything more. Thank you. All right. Thank you, Mr. Drivas. Mr. Kratz, three minutes. Thank you. I just want to highlight a few things specifically. With respect to the anticipation, the priority date claim, if the court is to accept a single sentence that existed in the application in 1990 as an enabling disclosure, that would be unprecedented and a foul of this court's precedence. In Genentech, the court specifically stated, there's a failure to meet the enablement requirement that cannot be rectified by asserting that all the disclosure related to the process is within the skill of the art. They had one sentence in their disclosure in 1990. They, in fact, hadn't been able to separate the enantiomers at that point. They, in fact, had to bring someone in specially to do it. They, in fact, claimed that that was new invention in 1992. They, in fact, never retracted that as a statement sworn to the patent office. But the fact still remains that regardless of the state of the art in 1990, the only enabling disclosure that they made is legally insufficient. They then replaced it with 12 pages of the actual disclosure of the experimental conditions and the starting materials and all the steps necessary to separate the enantiomers. They're entitled to 1992 as a priority date due to that disclosure being insufficient in 1990. You're just arguing that one of skill in the art wouldn't know how to do it. You're not adopting or putting forth the argument that it wasn't expressly part of the application. It was in the application because they absolutely knew of it, which gets around the Henry Hogan problem. They knew the enantiomers existed. They knew it was chiral, that the substance was. But they, in fact, didn't know how to separate it themselves. But more importantly, they didn't tell anyone how to do it. Does this mean that you don't agree with the Sun argument, which we heard a few minutes ago, that claims that this patent doesn't disclose pure R or pure S anywhere in it? No, we agree with some of Sun's claims. I didn't ask if you agree with some of them. I agree with that one. We agree that they did not claim the S and describe it sufficiently. So we do happen to agree with that. Well, no, what I didn't understand was that they didn't claim it. What I understood him to say is the disclosure doesn't demonstrate that the inventor possessed even the idea of pure R or pure S. And that seems to be directly contradictory to what you said a minute ago. They could conceive of it. They didn't possess it, is our position. They absolutely knew that this thing was chiral. They knew that there was an S and an R. They absolutely knew that. They didn't know how to separate it, and they tried. And they tried again and again and again. It wasn't until they brought in Dr. Ewan, who they claimed was an inventor, who figured out how to do it, and he gave the enabling disclosure that finds itself in the patent, 12 pages worth of enabling disclosure. But our argument, our legal argument, claim two is not entitled to 1990 priority date, instead of 1992. At that point in time, it's anticipated by the jurisdiction and Silverman references. Thank you, Mr. Kratz. That concludes our argument.